IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CHICAGO & VICINITY LABORERS' DISTRICT COUNCIL PENSION FUND, CHICAGO & VICINITY LABORERS' DISTRICT COUNCIL WELFARE FUND, CHICAGO & VICINITY LABORERS' DISTRICT COUNCIL RETIREE HEALTH AND WELFARE FUND, and CATHERINE WENSKUS, not individually but as Administrator of the Funds, <br> Plaintiffs, <br> v. <br> AGPD PAVING LLC, an Illinois corporation, also doing business as CARDI PAVING ASPHALT, and PATRICK DILLON, individually <br> Defendant. | Case No. 21 C 5001 |

## COMPLAINT

Plaintiffs, Chicago & Vicinity Laborers' District Council Pension Fund, Chicago & Vicinity Laborers' District Council Health & Welfare Fund, Chicago & Vicinity Laborers' District Council Retiree Health & Welfare Fund, and Catherine Wenskus, not individually but as Administrator of the Funds, (collectively the "Funds"), by their attorneys Patrick T. Wallace, Amy Carollo, G. Ryan Liska, Katherine C.V. Mosenson, and Sara Schumann, and for their Complaint against AGPD Paving LLC also doing business as Cardi Asphalt Paving and Patrick Dillon, individually, state:

## COUNT I

**(Failure to Submit Benefit Contributions)**

1.Jurisdiction is based on Sections 502(e)(1) and (2) and 515 of the Employee Retirement Income Security Act of 1974 ("ERISA"), as amended, 29 U.S.C. §§1132 (e)(1) and (2) and 1145, Section 301(a) of the Labor Management Relations Act ("LMRA") of 1947 as amended, and 29 U.S.C. §185(a), 28 U.S.C. §1331.

2.Venue is proper pursuant to Section 502(e)(2) of ERISA, 29 U.S.C. §1132(e)(2), and 28 U.S.C. §1391 (a) and (b).

3.The Funds are multiemployer benefit plans within the meanings of Sections 3(3) and 3(37) of ERISA. 29 U.S.C. §1002(3) and 37(A). They are established and maintained pursuant to their respective Agreements and Declarations of Trust in accordance with Section 302(c)(5) of the LMRA. 29 U.S.C. § 186(c)(5). The Funds have offices and conduct business within this District.

4.Plaintiff Catherine Wenskus ("Wenskus") is the Administrator of the Funds, and has been duly authorized by the Funds' Trustees to act on behalf of the Funds in the collection of employer contributions owed to the Funds and to the Construction and General Laborers' District Council of Chicago and Vicinity Training Fund, and with respect to the collection by the Funds of amounts which have been or are required to be withheld from the wages of employees in payment of Union dues for transmittal to the Construction and General Laborers' District Council of Chicago and Vicinity (the "Union"). With respect to such matters, Wenskus is a fiduciary of the Funds within the meaning of Section 3(21)(A) of ERISA, 29 U.S.C. §1002(21)(A).

5.Defendant AGPD Paving LLC, also d/b/a Cardi Asphalt Paving, (hereinafter referred to as "AGPD" or the "Company") is an Illinois limited liability corporation and at all

2

times relevant did business within this District and is an employer within the meaning of Section 3(5) of ERISA, 29 U.S.C. §1002(5), and Section 301(a) of the LMRA, 29 U.S.C. §185(c).

6. The Union is a labor organization within the meaning of 29 U.S.C. §185(a). At all times relevant herein, the Union and the Company have been parties to successive collective bargaining agreements, the most recent of which became effective June 1, 2021 (a true and accurate copy of the Independent Construction Industry Collective Bargaining Agreement signed by the Company which adopts and incorporates the various area-wide collective bargaining agreements and the Funds' respective Agreements and Declarations of Trust is attached hereto as Exhibit A).

7. AGPD entered into an Installment Note ("Note") with the Funds on or about November 25, 2020, with payments starting January 1, 2021 and ending on December 1, 2021. A true and accurate copy of the Note is attached as Exhibit B.

8. Defendant Patrick Dillon is a Manager of AGPD. Mr. Dillon signed a Security Agreement on or about November 25, 2020, individually guaranteeing payment of amounts due at the time of the Note was entered into and/or are incurred and become due and owing for the duration of the Note, including interest, liquidated damages, audit costs, and attorneys' fees and costs by providing the Funds and Union a continuing lien on and a security interest in Mr. Dillon's assets. A true and accurate copy of the Security Agreement is attached as Exhibit C.

9. Paragraph 7 of the Note provides that

> Payments made pursuant to this Installment Note shall be considered "contributions" as defined under the terms of the CBA and the Fund's respective Agreements and Declarations of Trust. If the contributions are not paid by the 10th day following the date on which the payment should have been received, the contribution shall be considered delinquent and all charges which apply to the late

payment of contributions under the terms of the CBA and the Fund's respective agreements and Declarations of Trust shall apply, including, but not limited to, the assessment of interest and liquidated damages. Further, in the event the Company fails to timely make any payments described in this Note, all amounts described in Paragraph 1 herein shall immediately become due on the 10th day following the date on which payment should have been received by the Fund's under the terms of this Note. In such event the Company further agrees to pay all attorney fees and costs incurred by the Funds in any action to enforce any part or all of this Note.

10. Paragraph 8 of the Note states that:

This Installment Note is conditioned on the Company staying current on its obligations to the Funds and District Council under the terms of the CBA and the Funds' respective Agreements and Declarations of Trust. In the event that the Company fails to maintain its obligations under the terms of the CBA and the Funds' respective Agreements and Declarations of Trust, including, but not limited to, its obligations to submit timely contributions and dues reports and to make timely contribution and dues payments by the tenth day following the month in which laborers' work was performed, then the Funds shall have the right to accelerate and collect all amounts due under this Installment Note, plus payment of all attorneys' fees and costs incurred by the Funds in any action to accelerate this Installment Note.

*See* Exhibit B, ¶ 8.

11. Through the Security Agreement, Mr. Dillon guarantied the amounts owed pursuant to the Note, including but not limited to, "any wages, contributions, dues, interest, liquidated damages, audit costs and attorneys' fees and costs that are or become due from the Company during the commercial security agreement." *See* Exhibit C, ¶¶ 1(d) and 2.

12. Paragraph 7 of the Security Agreement states that:

The Debtor shall…be in default under this Agreement upon the happening of …a failure to pay any amount due under the Note within ten (10) days of the date the same is due.

*See* Exhibit C, ¶ 7.

13. The Funds have been duly authorized to serve as collection agents for the Union in that the Funds have been given the authority to collect from employers union dues which should have been or have been deducted from the wages of covered employees. Further, the Funds have been duly authorized by the Construction and General Laborers' District Council of Chicago and Vicinity Training Fund (the "Training Fund"), the Midwest Construction Industry Advancement Fund ("MCIAF"), the Mid-American Regional Bargaining Association Industry Advancement Fund ("MARBA"), the Chicagoland Construction Safety Council (the "Safety Fund"), the Laborers' Employers' Cooperation and Education Trust ("LECET"), the Industry Advancement Fund ("IAF"), the Concrete Contractors Association ("CCA"), the CDCNI/CAWCC Contractors' Industry Advancement Fund (the "Wall & Ceiling Fund"), the CISCO Uniform Drug/Alcohol Abuse Program ("CISCO"), the Laborers' District Council Labor Management Committee Cooperative ("LDCLMCC"), the Will Grundy Industry Trust Advancement Fund ("WGITA"), the Illinois Environmental Contractors Association Industry Education Fund ("IECA Fund"), the Illinois Small Pavers Association Fund ("ISPA"), and the Chicago Area Independent Construction Association ("CAICA") to act as an agent in the collection of contributions due to those Funds.

14. The Agreement and the Funds' respective Agreements and Declarations of Trust obligate the Company to make contributions on behalf of its employees covered by the Agreement, and to submit monthly remittance reports in which the Company, *inter alia*, identifies the employees covered under the Agreements and the amount of contributions to be remitted to the Funds on behalf of each covered employee. Pursuant to the terms of the Agreement, and the Funds' respective Agreements and Declarations of Trust, contributions

which are not submitted in a timely fashion are assessed 20 percent liquidated damages plus interest.

15. The Agreement and the Funds' respective Agreements and Declarations of Trust requires the Company to submit its books and records to the Funds on demand for an audit to determine benefit contribution compliance.

16. The Agreement requires the Company to obtain and maintain a surety bond to guaranty the payment of future wages, pension and welfare benefits.

17. Notwithstanding the obligations imposed by the Agreement and the Funds' respective Agreements and Declarations of Trust, Company performed covered work during the months of July 2021 forward, but has:

(a) failed to submit reports and contributions to Plaintiff Chicago & Vicinity Laborers' District Council Pension Fund ("Pension Fund") for the period of July 2021 forward, thereby depriving the Pension Fund of contributions, income and information needed to administer the Fund and jeopardizing the pension benefits of the participants and beneficiaries;

(b) failed to submit reports and contributions to Plaintiff Chicago & Vicinity Laborers' District Council Health & Welfare Fund ("Welfare Fund") for the period of July 2021, thereby depriving the Welfare Fund of contributions, income and information needed to administer the Fund and jeopardizing the health and welfare benefits of the participants and beneficiaries;

(c) failed to submit reports and contributions owed to Plaintiff Chicago & Vicinity Laborers' District Council Retiree Health & Welfare Fund ("Retiree Welfare Fund") for the period of July 2021 forward, thereby depriving the Retiree Welfare Fund of contributions,

income and information needed to administer the Fund and jeopardizing the health and welfare benefits of the participants and beneficiaries;

(d) failed to submit reports and contributions to Laborers' Training Fund for the period of July 2021 forward , thereby depriving the Laborers' Training Fund of contributions, income and information needed to administer the Fund and jeopardizing the training fund benefits of the participants and beneficiaries; and

(e) failed to report and pay all contributions owed to one or more of the other affiliated funds identified above for the period of July 2021 forward, thereby depriving said fund(s) of contributions, income and information needed to administer said fund(s) and jeopardizing the benefits of the participants and beneficiaries.

18. Company's and Mr. Dillon's actions in failing to submit timely reports and contributions violate Section 515 of ERISA, 29 U.S.C. §1145, and Section 301 of the LMRA. 29 U.S.C. §185, federal common law interpreting ERISA, 29 U.S.C. §1132 (g)(2), the Note, and the Security Agreement.

19. Pursuant to Section 502(g)(2) of ERISA, 29 U.S.C. §1132 (g)(2), Section 301 of the LMRA, 29 U.S.C. §185, federal common law, and the terms of the Agreement, the Note, Security Agreement, and the Funds' respective Trust Agreements, Company and Mr. Dillon are liable to the Funds for delinquent contributions, liquidated damages, interest, accumulated liquidated damages, audit costs, reasonable attorneys' fees and costs, and such other legal and equitable relief as the Court deems appropriate.

WHEREFORE, Plaintiffs respectfully request this Court enter a judgment jointly and severally, against Defendants AGPD Paving LLC also d/b/a Cardi Asphalt and Patrick Dillon, individually, as follows:

    a.    ordering the Company and Mr. Dillon to submit benefits reports and contributions for the time period of July 2021 forward;

    b.    entering judgment in sum certain against the Company and Mr. Dillon, jointly and severally, on the amounts due and owing pursuant to the amounts pleaded in the Complaint, the July 2021 forward reports, including contributions, interest, liquidated damages, accumulated liquidated damages, and attorneys' fees and costs;

    c.    ordering AGPD Paving LLC also d/b/a Cardi Asphalt and Mr. Dillon to submit the Company's books and records for a fringe benefit compliance audit upon demand;

    d.    enter judgment in sum certain against AGPD Paving LLC also d/b/a Cardi Asphalt and Mr. Dillon on amounts due and owing pursuant to the audit, if any, including interest, liquidated damages, audit cost and attorney fees and costs; and

    e.    awarding Plaintiffs any further legal and equitable relief as the Court deems appropriate.

## COUNT II

### (Failure To Submit Reports and Pay Union Dues)

20.    Plaintiffs re-allege paragraphs 1 through 19 of Count I.

21.    Pursuant to agreement, the Funds have been duly designated to serve as collection agents for the Union in that the Funds have been given the authority to collect from employers union dues which should have been or have been deducted from the wages of covered

employees.

22. Dues reports and contributions are due by the 10th day following the month in which the work was performed. Dues reports and contributions which are not submitted in a timely fashion are assessed liquidated damages.

23. Notwithstanding the obligations imposed by the Agreement and Note and Security Agreement, the Company and Mr. Dillon failed to submit Union dues reports and dues that were or should have been withheld from the wages of its employees performing covered work for the period of May 2021 forward.

24. Pursuant to the Agreement, Note and Security Agreement, Company and Mr. Dillon are jointly and severally liable to the Funds for the unpaid union dues, as well as liquidated damages, interest, accumulated liquidated damages, audit costs, reasonable attorneys' fees and costs as the Union's collection agent, and such other legal and equitable relief as the Court deems appropriate.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendants AGPD Paving LLC d/b/a Cardi Asphalt Paving. and Patrick Dillon, individually:

a. ordering the Company and Mr. Dillon to submit dues reports and pay all dues for the time period of May 2021 forward;

b. ordering the Company and Mr. Dillon to submit its accumulated liquidated damages on its untimely paid dues reports;

c. ordering the Company and Mr. Dillon to submit the Company's books and records to an audit upon demand;

      d.      entering judgment in sum certain, jointly and severally, against AGPD Paving LLC also d/b/a Cardi Asphalt Paving and Patrick Dillon on the May 2021 forward dues reports, accumulated liquidated damages and amounts due and owing, if any, as revealed by the audit upon demand, including dues contributions, liquidated damages, accumulated liquidated damages, interest, audit costs, and attorneys' fees and costs; and

      e.      awarding Plaintiffs any further legal and equitable relief as the Court deems appropriate.

## COUNT III
### (Default on Installment Note and Security Agreement)

25.      Plaintiffs re-allege Paragraphs 1 through 24.

26.      The Company entered into a Note with the Funds on or about November 25, 2020 to submit payment of contributions owed to the Funds for the period of July through October 2020. *See* Exhibit B.

27.      Simultaneously with the execution of the Note, Defendant Patrick Dillon, signed a Security Agreement on or about November 25, 2020, individually guaranteeing payment of the amounts due pursuant to the Note with the Funds. The Security Agreement incorporates the obligations incurred under the Note. *See* Exhibit C.

28.      Paragraph 8 of the Note states that it is:

> Conditioned on the Company staying current on its obligations to the Funds and District Council under the terms of the CBA and the Funds' respective Agreements and Declarations of Trust. In the event that the Company fails to maintain its obligations under the terms of the CBA and the Funds' respective Agreements and Declarations of Trust, including, but not limited to, its obligations to submit timely contributions and dues reports and to make timely contribution and dues payments by the tenth day following the month in which laborers' work was performed, then the Funds shall have the right to accelerate

and collect all amounts due under this Installment Note, plus payment of all attorneys' fees and costs incurred by the Funds in any action to accelerate this Installment Note.

*See* Exhibit B, ¶ 8.

29. Default under the Security Agreement occurs upon "a failure to pay any amount due under the Note within ten (10) days of the date the same is due." See Exhibit C, ¶ 7,

30. The Company failed to submit timely contributions and dues reports and to make timely contribution and dues payments by the tenth day following the month in which laborers' work was performed. Specifically, the Company failed to pay its July 2021 forward benefits reports and May 2021 forward dues reports.

31. Pursuant to the terms of the Agreement, the Funds' respective Trust Agreements, the Note, and the Security Agreement, the Company and Mr. Dillon are liable to the Funds for the full accelerated amount of the Note, plus liquidated damages and interest on late-paid Note payments, reasonable attorneys' fees and costs, and such other legal and equitable relief as the Court deems appropriate.

WHEREFORE, Plaintiffs respectfully request this Court enter a judgment against Defendants AGPD Paving LLC also d/b/a Cardi Aphalt and Patrick Dillon, jointly and severally, as follows:

a. entering judgment in sum certain against the Company and Mr. Dillon on the amounts due and owing on the defaulted Note, including unpaid contributions, interest, liquidated damages, and the attorneys' fees and costs incurred by the Funds; and

   b.  awarding Plaintiffs any further legal and equitable relief as the Court deems appropriate.


September 21, 2021          Laborers' Pension Fund, et al.

                  By: <u>/s/ Amy Carollo</u>

Office of Fund Counsel
111 W. Jackson Blvd., Suite 1415
Chicago, IL 60604
(312) 692-1540



## CONSTRUCTION & GENERAL LABORERS' DISTRICT COUNCIL OF CHICAGO AND VICINITY

AFFILIATED WITH THE LABORERS' INTERNATIONAL UNION OF NORTH AMERICA

999 McCLINTOCK DRIVE • SUITE 300 • BURR RIDGE, IL 60527 • PHONE: 630/655-8209 • FAX: 630/655-8853

### INDEPENDENT CONSTRUCTION INDUSTRY COLLECTIVE BARGAINING AGREEMENT

It is hereby stipulated and agreed by and between **AGPD Paving LLC DBA CARDI Asphalt** ("Employer") and the Construction and General Laborers' District Council of Chicago and Vicinity, Laborers' International Union of North America, AFL-CIO ("Union"), representing and encompassing its affiliated Local Unions, including Local Nos. 1, 2, 4, 5, 6, 68, 75, 76, 152, 225, 582, 681, 1001, 1035, 1092, together with any other Local Unions that may come within its jurisdiction ("Local Unions"), and encompassing the geographic areas of Cook, Lake, DuPage, Will, Grundy, Kendall, Kane, McHenry and Boone counties, Illinois, that:

1. **Recognition.** In response to the Union's request for recognition as the majority representative of the unit employees, the Employer recognizes the Union as the sole and exclusive collective bargaining representative under Section 9(a) of the NLRA for the employees now and hereinafter employed under this Agreement with respect to wages, hours and other terms and conditions of employment. This recognition is based on the Union having shown, or having offered to show, evidence of its majority support. The Employer has not assigned its bargaining rights to any entity for purposes of multi-employer bargaining, and it hereby revokes its prior assignment of bargaining rights, if any. The Employer further voluntarily elects not to assign such bargaining rights to any person, entity or association for purposes of multi-employer bargaining without prior written approval from the Union. Notwithstanding the number of persons employed under this Agreement, the Employer shall abide by this Agreement and all extensions hereof, and it waives any right or defenses it may have to terminate this agreement or refuse to negotiate a successor agreement based upon the number of persons employed, and it consents to enforcement of this commitment directly through any tribunal or court of competent jurisdiction.

2. **Labor Contract.** The Employer affirms and adopts the applicable Collective Bargaining Agreement(s), as designated by the Union in its sole discretion, between the Union and the Builders Association, the Chicago Area Independent Construction Association, the Chicago Area Rail Contractors Association, the Chicago Area Scaffolding Association, the Chicago Demolition Contractors' Association, the Concrete Contractors Association of Greater Chicago, the Contractors Association of Will and Grundy Counties, the Fox Valley Associated General Contractors, the Great Lakes Contractors Association, the Midwest Wall and Ceiling Contractors, the Illinois Environmental Contractors Association, the Illinois Road and Transportation Builders Association, the Illinois Small Pavers Association, the Mason Contractors Association of Greater Chicago, the Underground Contractors Association, and all other employer associations with whom the Union or its affiliated Local Unions have an agreement. If the applicable Collective Bargaining Agreement(s) expire during the term of this Agreement, any limitation on the right to strike shall also expire until a successor labor agreement has been established, which shall be incorporated retroactively herein. This Agreement supersedes all contrary terms in the applicable Collective Bargaining Agreement(s).

3. **Total economic increase.** The Employer shall pay its employees a total economic increase of $2.17 per hour effective June 1, 2017; $2.24 per hour effective June 1, 2018; $2.31 per hour effective June 1, 2019; and $2.39 per hour effective June 1, 2020, said amounts to be allocated between wages, fringe benefits and other funds by the Union in its sole discretion. Effective June 1, 2017, the minimum wage rate shall be $41.20 per hour.

4. **Checkoff Deductions and Remittances.** The Employer shall deduct from the wages of employees uniform initiation fees, assessments, membership dues, and working dues in such amounts as the Union shall from time to time establish, and shall remit monthly to the designated Union office the sums so deducted, together with an accurate list showing the employees from whom dues were deducted, the employees' individual hours, gross wages and deducted dues amounts for the monthly period, not later than the tenth (10th) day of the month following the month for which said deductions were made. If the Employer fails to timely remit any amounts to the Union or its affiliated fringe benefit funds that are required under this Agreement, it shall be obligated to the Union for all costs of collection, including attorney fees.

The Employer shall further deduct an amount designated by the Union for each hour that an employee receives wages under the terms of this Agreement on the basis of individually signed voluntary authorized deduction forms and shall pay over the amount so deducted to the Laborers' Political League ("LPL") or to a designated appointee, not later than the tenth (10th) day of the month next following the month for which such deductions were made. LPL remittances shall include a report of the hours worked by each Laborer for whom deductions are made. Remittances shall be made by a separate check payable to the Laborers' Political League. The Employer shall be paid a processing fee each month from the total amount to be transmitted to the LPL to be calculated at the Illinois Department of Revenue or other applicable standard.

5. **Work Jurisdiction.** This Agreement covers all work within the applicable Collective Bargaining Agreements and all work within the Union's trade and geographic jurisdiction as set forth in the Union's Statement of Jurisdiction, which are incorporated by reference into this Agreement. The Employer shall assign all work described therein to its Union-represented Laborer employees and acknowledges the appropriateness of such work assignments as required under this Agreement. Neither the Employer nor its work assignments as required under this Agreement shall be stipulated or otherwise subject to adjustment by any jurisdictional disputes board or mechanism except upon written notice by and direction of the Union.

6. **Subcontracting.** The Employer, whether acting as a contractor, general manager or developer, shall not contract or subcontract any covered work to be done at the site of construction, alteration, painting or repair of a building, structure or other work to any person, corporation or entity not signatory to and covered by a collective bargaining agreement with the Union. This obligation applies to all tiers of subcontractors performing work at the site of construction. The Employer shall further assume the obligations of all tiers of its subcontractors for prompt payment of employees' wages and other benefits required under this Agreement, including reasonable attorneys' fees incurred in enforcing the provisions hereof.

7. **Fringe Benefits.** The Employer agrees to pay the amounts that it is bound to pay under said Collective Bargaining Agreements to the Health and Welfare Department of The Construction and General Laborers' District Council of Chicago and Vicinity, the Laborers' Pension Fund (including Laborers' Excess Benefit Funds), the Fox Valley Benefit Funds, the Construction and General Laborers' District Council of Chicago and Vicinity Apprentice and Training Trust Fund, the Chicago Area Laborers-Employers Cooperation Education Trust, the LDC/LMCC, and to all other designated Union-affiliated benefit and labor-management funds (the "Funds"), and to become bound by and be considered a party to the agreements and declarations of trust creating the Funds. The Employer further affirms that all prior contributions paid to the Welfare, Pension, Training and other Funds were made by its duly authorized agents at all proper rates, and evidence the Employer's intent to be bound by the trust agreements and Collective Bargaining Agreements in effect when the contributions were made, and acknowledging the report form to be a sufficient instrument in writing to bind the Employer to the applicable collective bargaining agreements.

8. **Contract Enforcement.** All grievances filed by either party arising hereunder shall, at the Union's discretion, be submitted to the Chicago District Council Grievance Committee for final and binding disposition in lieu of another grievance committee, provided that deadlocked grievances shall be submitted to final and binding arbitration upon timely demand. Should the Employer fail to comply within ten (10) days with any binding grievance award, whether by grievance committee or arbitration, it shall be liable for all costs and legal fees incurred by the Union to enforce the award. Notwithstanding anything to the contrary, nothing herein shall limit the Union's right to strike or withdraw its members because of non-payment of wages and/or fringe benefit contributions, failure by the Employer to timely remit dues to the Union, or non-compliance with a binding grievance award. The Employer's violation of any provision of this paragraph will give the Union the right to take any other legal and economic action, including but not limited to all remedies at law or equity. It is expressly understood and agreed that the Union's right to take economic action is in addition to, and not in lieu of, its rights under the grievance procedures. Where necessary to correct contract violations, or where no acceptable steward is currently employed, the Union may appoint and place a steward from outside the workforce at all job sites.

9. **Successors.** In the event of any change in the ownership, management or operation of the Employer's business or substantially all of its assets, by sale or otherwise, it is agreed that as a condition of such sale or transfer that the new owner or manager, whether corporate or individual, shall be fully bound by the terms and conditions of this Agreement. The Employer shall provide no less than ten (10) days' prior written notice to the Union of the sale or transfer and shall be obligated for all expenses incurred by the Union to enforce the terms of this paragraph.

10. **Termination.** This Agreement shall remain in full force and effect from June 1, 2017 (unless dated differently below) through May 31, 2021, and shall continue thereafter unless there has been given written notice, by certified mail by either party hereto, received no less than sixty (60) nor more than ninety (90) days prior to the expiration date, of the desire to modify or amend this Agreement through negotiations. In the absence of such timely and proper notice, the Employer and the Union agree to be bound by the new applicable association agreement(s), incorporating them into this Agreement and extending this Agreement for the life of the newly negotiated agreements, and thereafter for the duration of successive agreements, unless and until timely notice of termination is given not less than sixty (60) nor more than ninety (90) days prior to the expiration of each successive Collective Bargaining Agreement. Notwithstanding the foregoing, the Union in its sole discretion may terminate this Agreement at any time upon written notice should the Employer fail to comply with its bonding obligations or if the Employer is a joint employer with or alter ego of another entity with an outstanding delinquency to the Union's affiliated fringe benefit funds.

11. **Execution.** The signatory below warrants his or her receipt of the applicable Collective Bargaining Agreement(s) and authorization from the Employer to execute this Agreement, without fraud or duress, and with full knowledge of the obligations and undertakings contained herein. The parties acknowledge and accept facsimile and electronic signatures on this Agreement as if they were the original signatures.

Dated: **2-5**, 20 **20**

ACCEPTED:
Laborers' Local Union No. _____

By: _____

CONSTRUCTION AND GENERAL LABORERS'
DISTRICT COUNCIL OF CHICAGO AND VICINITY

By: _James P. Connolly, Business Manager_

By: _Charles LoVerde, Secretary-Treasurer_

For Office Use Only: _____

**CARDI Asphalt**
FEIN No.: _____
By: **Pat Dillon      V.P.**
(Print Name and Title)

(Signature)

**4226 Lawndale**
(Address)
**Lyons    IL    60534**
(City, State and Zip Code)
**773-631-0025**
(Telephone/Telefax)
**patrick@CARDIasphalt.com**
(Email Address)

Ex. A

Effective June 1, 2017    WHITE - LOCAL UNION • CANARY - TRUST FUND • PINK - DISTRICT COUNCIL • GOLD - EMPLOYER

## INSTALLMENT NOTE

This Installment Note ("Note") is made between the Chicago & Vicinity Laborers' District Council Pension Plan ("Pension Fund"), the Chicago & Vicinity Laborers' District Council Welfare Plan ("Welfare Fund"), and the Chicago & Vicinity Laborers' District Council Retiree Health and Welfare Plan ("Retiree Welfare Fund") ("Welfare Funds") (collectively referred to herein as the "Funds"), the parties of the first part, and AGPD Paving LLC also d/b/a Cardi Asphalt (the "Company"), the party of the second part.

WHEREAS, the Company has at all relevant times been party to a collective bargaining agreement ("CBA") with the Construction and General Laborers' District Council of Chicago and Vicinity ("District Council"), whereunder it is obligated to make certain contributions to the above-named Funds, as well as to the Training Fund, on behalf of its covered employees, and to submit payment of all employee union dues.

WHEREAS, the Company has failed to timely pay certain contributions owed to the Funds for the remittance reports covering the period of July – October 2020.

WHEREAS, the Company desires to pay all delinquencies owed to the Funds, to pay all union dues owed to the District Council, together with liquidated damages, and interest, as set forth below, and further desires to remain current in its obligation to pay contributions to the Funds.

**THE PARTIES HEREBY AGREE as follows:**

1. The Company will pay $168,182.61 to the Welfare Fund (comprised of $133,281.40 in delinquent contributions, $26,656.28 in liquidated damages and $9,244.93 in interest) (based on an interest rate of 12%). The Company will pay $81,862.61 to the Retiree Welfare Fund (comprised of $64,491.00 in delinquent contributions, $12,898.20 in liquidated damages and $4,473.41 in interest). The Company will also pay $221,574.69 to the Pension Fund (comprised of $174,555.64 in delinquent contributions, $34,911.13 in liquidated damages and $12,107.92 in interest). All of these amounts shall be paid according to the schedule described below in paragraphs 3 and 4.

2. The Company will also pay $13,435.65 to the Training Fund (comprised of $11,055.60 in delinquent contributions, $2,211.12 in liquidated damages and $168.93 in interest).

3. Simultaneously with the execution of this Note, the Company will pay twenty percent (20%) of the total outstanding indebtedness, excluding note interest and including the delinquent amounts described above in paragraph 2, or $32,394.85 to the Welfare Fund, $15,674.93 to the Retiree Welfare Fund and $42,426.81 to the Pension Fund.

4. For twelve (12) consecutive months commencing on January 1, 2021 and ending on December 1, 2021, the Company will pay $11,398.98 per month to the Welfare Fund, $5,515.64 to the Retiree Welfare Fund and $14,928.99 per month to the Pension Fund.

5. The Company will remit all payments to the Funds' Administrative Offices, which are located at 11465 Cermak Road, Westchester, Illinois 60154.

6. The Company understands and agrees that this Installment Note is based on reports submitted by the Company to the Funds and that the Funds reserve the right to conduct an audit, in accordance with the terms of the CBA and the Funds' respective Agreements and Declarations of Trust, to determine benefit contribution compliance for the time period covered herein and further reserve the right to collect any unpaid contributions, union dues, interest, liquidated damages, and audit costs as shown on said audit.

7. Payments made pursuant to this Installment Note shall be considered "contributions" as defined under the terms of the CBA and the Funds' respective Agreements and Declarations of Trust. If the contributions are not paid by the 10th day following the date on which payment should have been received, the contribution shall be considered delinquent and all charges which apply to the late payment of contributions under the terms of the CBA and the Funds' respective Agreements and Declarations of Trust shall apply, including, but not limited to, the assessment of interest and liquidated damages. Further, in the event the Company fails to timely make any payments described in this Note, all amounts described in paragraph 1 herein shall immediately become due on the 10th day following the date on which payment should have been received by the Funds under the terms of this Note. In such event the Company further agrees to pay all attorneys' fees and costs incurred by the Funds in any action to enforce any part of this Note.

**Exhibit B**

8. This Installment Note is conditioned on the Company staying current on its obligations to the Funds and District Council under the terms of the CBA and the Funds' respective Agreements and Declarations of Trust. In the event that the Company fails to maintain its obligations under the terms of the CBA and the Funds' respective Agreements and Declarations of Trust, including, but no limited to, its obligations to submit timely contribution and dues reports and to make timely contribution and dues payments by the tenth day following the month in which laborers' work was performed, then the Funds shall have the right to accelerate and collect all amounts due under this Installment Note, plus payment of all attorneys' fees and costs incurred by the Funds in any action to accelerate this Installment Note. The Company must also complete and submit monthly Job Notice Cover Sheets and individual Job Notices on the forms provided by the Funds by the first day of each month for the duration of this Note. Failure to comply with this term will result in a default on this Note and enable the Funds to accelerate all amounts due on this Note.

9. The Parties acknowledge and agree that any payments to the District Council provided for in this Installment Note fully comport with 29 U.S.C. § 186(c)(2) and that they involve the compromise, adjustment, settlement, or release of a claim, complaint, grievance, or dispute in the absence of fraud or duress.

10. The Company further agrees to obtain and maintain a surety bond to insure the payment of wages and benefit contributions as required under the terms of the CBA.

11. The Company shall have the right to prepay the entire amount due under the Note prior to the date upon which payment is due without penalty and without payment of any precalculated Note interest that has not accrued as of the date full payment has been made.

The Parties hereby agree to these terms by their execution hereof on the __25__ day of the __11__, 2020.

AGPD Paving LLC also d/b/a Cardi Asphalt

By: _____

Title: __President__

Chicago & Vicinity Laborers' District Council Pension Plan, the Chicago & Vicinity Laborers' District Council Welfare Plan and the Chicago & Vicinity Laborers' District Council Retiree Health and Welfare Plan

By: _____
Catherine Wenskus

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (the "**Agreement**"), dated as of this 25 day of Nov, 2020 is made by and between Patrick Dillon, an individual, (the "**Debtor**"), with an address at ███████████████████████████████████, and Chicago & Vicinity Laborers' District Council Pension Plan, Chicago & Vicinity Laborers' District Council Health & Welfare Plan, the Chicago & Vicinity Laborers' District Council Retiree Health and Welfare Plan, and agent of the Chicago Laborers' Training Fund, The Chicago Area Laborers-Employers Cooperation and Education Trust, The Laborers' District Council Labor-Management Cooperation Committee, The Chicago Area Independent Construction Association Fund Industry Advancement Fund, and the Construction and General Laborers' District Council of Chicago and Vicinity (collectively referred to herein as the "**Secured Party**"), with an address at 11465 Cermak Road, Westchester, IL 60154.

Under the terms hereof, the Secured Party desires to obtain and the Debtor desires to grant the Secured Party security for all of the Obligations (as hereinafter defined).

**NOW, THEREFORE,** the Debtor and the Secured Party, intending to be legally bound, hereby agree as follows:

**1. Definitions.**

(a) "**Collateral**" shall include the Debtor's tangible personal property, fixtures, leasehold improvements, cash, bank accounts, investments and other personal property wherever located, including Debtor's personal residence(s), (the "**Personal Property**"); all general intangibles relating to or arising from the Personal Property, all cash and non-cash proceeds (including insurance proceeds) of the Personal Property, and all additions and accessions thereto, substitutions therefor and replacements thereof.

(b) "**Loan Documents**" means the Note (as hereafter defined), this Agreement and all other documents and instruments evidencing, securing or executed in connection therewith.

(c) "**Note**" means that certain Installment Note and Guaranty of Payment and Indemnification Agreement entered into by AGPD Paving LLC also d/b/a CARDI Asphalt ("the Company"), Patrick Dillon and Amit Gauri with the Secured Party, dated as of the date hereof, in the original principal amount of $486,055.56. The term "Note" shall also mean and include without limitation all promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security agreements, mortgages, deeds of trust, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Obligations.

(d) "**Obligations**" shall include any wages, contributions, dues, interest, liquidated damages, audit costs and attorneys' fees and costs that are or become due from the Company during the commercial security agreement between the Company and the Secured Party, all debts, liabilities, obligations, covenants and duties owing from the Debtor to the Secured Party of any kind or nature, present or future (including any interest accruing thereon after maturity, or after the filing of any petition in bankruptcy, or the commencement of any insolvency, reorganization or like proceeding relating to the Debtor, whether or not a claim for post-filing or post-petition interest is allowed in such proceeding), whether evidenced by or arising under the Note or this Agreement or, whether absolute or contingent, joint or several, due or to become due, now existing or hereafter arising, and all costs and expenses of the Secured Party incurred in the enforcement, collection or otherwise in connection with any of the foregoing, including reasonable attorneys' fees and expenses.

(e) "**UCC**" means the Uniform Commercial Code, as adopted and enacted and as in effect from time to time in the States of Illinois. Terms used herein which are defined in the UCC and not otherwise defined herein shall have the respective meanings ascribed to such terms in the UCC.

**2. Grant of Security Interest.** To secure the Obligations, the Debtor, as debtor, hereby assigns and grants to the Secured Party, as secured party, a continuing lien on and security interest in the Collateral.

Exhibit C

3. **Representations and Warranties.** The Debtor represents, warrants and covenants to the Secured Party that: (a) the Debtor has good, marketable and indefeasible title to the Collateral, has not made any prior sale, pledge, encumbrance, assignment or other disposition of any of the Collateral, and the Collateral is free from all encumbrances and rights of setoff of any kind except the lien in favor of the Secured Party created by this Agreement; (b) except as herein provided, the Debtor will not hereafter without the Secured Party's prior written consent sell, pledge, encumber, assign or otherwise dispose of any of the Collateral or permit any right of setoff, lien or security interest to exist thereon except to the Secured Party; and (c) the Debtor will defend the Collateral against all claims and demands of all persons at any time claiming the same or any interest therein.

4. **Debtor's Covenants.** The Debtor covenants that it shall:

(a) from time to time and at all reasonable times allow the Secured Party, by or through any of its officers, agents, attorneys, or accountants, to examine or inspect the Collateral, and obtain valuations and audits of the Collateral, at the Debtor's expense, wherever located. The Debtor shall do, obtain, make, execute and deliver all such additional and further acts, things, deeds, assurances and instruments as the Secured Party may require to vest in and assure to the Secured Party its rights hereunder and in or to the Collateral, and the proceeds thereof, including waivers from landlords, warehousemen and mortgagees;

(b) keep the Collateral in good order and repair at all times and immediately notify the Secured Party of any event causing a material loss or decline in value of the Collateral, whether or not covered by insurance, and the amount of such loss or depreciation;

(c) only use or permit the Collateral to be used in accordance with all applicable federal, state, county and municipal laws and regulations; and

(d) have and maintain insurance at all times with respect to all Collateral against risks of fire (including so-called extended coverage), theft, sprinkler leakage, and other risks (including risk of flood if any Collateral is maintained at a location in a flood hazard zone) as the Secured Party may reasonably require, in such form, in the minimum amount of the outstanding principal of the Note and written by such companies as may be reasonably satisfactory to the Secured Party. Each such casualty insurance policy shall contain a standard Lender's Loss Payable Clause issued in favor of the Secured Party under which all losses thereunder shall be paid to the Secured Party as the Secured Party's interest may appear. Such policies shall expressly provide that the requisite insurance cannot be altered or canceled without at least thirty (30) days prior written notice to the Secured Party and shall insure the Secured Party notwithstanding the act or neglect of the Debtor. Upon the Secured Party's reasonable demand, the Debtor shall furnish the Secured Party with evidence of insurance as the Secured Party may require. In the event of failure to provide insurance as herein provided, the Secured Party may, at its option, obtain such insurance and the Debtor shall pay to the Secured Party, on demand, the cost thereof. Proceeds of insurance may be applied by the Secured Party to reduce the Obligations or to repair or replace Collateral, all in the Secured Party's sole discretion.

(e) If any of the Collateral is, at any time, in the possession of a bailee, Debtor shall promptly notify Secured Party thereof and, if requested by Secured Party, shall promptly obtain an acknowledgment from the bailee, in form and substance satisfactory to Secured Party, that the bailee holds such Collateral for the benefit of Secured Party and shall act upon the instructions of Secured Party, without the further consent of Debtor.

5. **Negative Pledge; No Transfer.** The Debtor will not sell or offer to sell or otherwise transfer or grant or allow the imposition of a lien or security interest upon the Collateral or use any portion thereof in any manner inconsistent with this Agreement or with the terms and conditions of any policy of insurance thereon.

6. **Further Assurances.** Debtor hereby irrevocably authorizes Secured Party at any time and from time to time to file in the States of Illinois any financing statements, amendments and extensions thereto that indicate the Collateral as all non-excluded assets of Debtor or words of similar effect. Debtor agrees to furnish any such information to Secured Party promptly upon request. Debtor and Secured Party agree that this Security Agreement shall amend and relate back to the previous Commercial Security Agreement filed with the Illinois Secretary of State on February 13, 2013 and extended on February 1, 2018, as such agreements relate to Debtor.

**7. Events of Default.** The Debtor shall, at the Secured Party's option, be in default under this Agreement upon the happening of any of the following events or conditions (each, an "**Event of Default**"): (a) a failure to pay any amount due under the Note within ten (10) days of the date the same is due; (b) the failure by the Debtor to perform any of its other obligations under this Agreement within thirty (30) days of notice from Secured Party of the same; (c) falsity, inaccuracy or material breach by the Debtor of any written warranty, representation or statement made or furnished to the Secured Party by or on behalf of the Debtor; (d) an uninsured material loss, theft, damage, or destruction to any of the Collateral, or the entry of any judgment against the Debtor or any lien against or the making of any levy, seizure or attachment of or on the Collateral; or (e) any indication or evidence received by the Secured Party that the Debtor may have directly or indirectly been engaged in any type of activity which, in the Secured Party's discretion, might result in the forfeiture of any property of the Debtor to any governmental entity, federal, state or local.

**8. Remedies.** Upon the occurrence of any such Event of Default, uncured after notice, and at any time thereafter, the Secured Party may declare all Obligations secured hereby immediately due and payable and shall have, in addition to any remedies provided herein or by any applicable law or in equity, all the remedies of a secured party under the UCC. The Secured Party's remedies include, but are not limited to, to the extent permitted by law, the right to (a) peaceably by its own means or with judicial assistance enter the Debtor's premises and take possession of the Collateral without prior notice to the Debtor or the opportunity for a hearing, (b) render the Collateral unusable, (c) dispose of the Collateral on the Debtor's premises, and (d) require the Debtor to assemble the Collateral and make it available to the Secured Party at a place designated by the Secured Party. Unless the Collateral is perishable or threatens to decline speedily in value or is of a type customarily sold on a recognized market, the Secured Party will give the Debtor reasonable notice of the time and place of any public sale thereof or of the time after which any private sale or any other intended disposition thereof is to be made. The requirements of commercially reasonable notice shall be met if such notice is sent to the Debtor at least five (5) days before the time of the intended sale or disposition. Expenses of retaking, holding, preparing for sale, selling or the like shall include the Secured Party's reasonable attorney's fees and legal expenses, incurred or expended by the Secured Party to enforce any payment due it under this Agreement either as against the Debtor, or in the prosecution or defense of any action, or concerning any matter growing out of or connection with the subject matter of this Agreement and the Collateral pledged hereunder. The Debtor waives all relief from all appraisement or exemption laws now in force or hereafter enacted.

**9. Payment of Expenses.** At its option, the Secured Party may, but is not required to: discharge taxes, liens, security interests or such other encumbrances as may attach to the Collateral; pay for required insurance on the Collateral; and pay for the maintenance, appraisal or reappraisal, and preservation of the Collateral, as determined by the Secured Party to be necessary. The Debtor will reimburse the Secured Party on demand for any payment so made or any expense incurred by the Secured Party pursuant to the foregoing authorization, and the Collateral also will secure any advances or payments so made or expenses so incurred by the Secured Party.

**10. Notices.** All notices, demands, requests, consents, approvals and other communications required or permitted hereunder must be in writing and sent via Certified Mail to the address above, or to such other address as any party may give to the other in writing for such purpose. Notice shall be deemed effective upon receipt of the Certified Mail by Debtor, unless said Certified Mail is refused by Debtor, in which case notice shall be deemed effective upon such refusal.

**11. Preservation of Rights.** No delay or omission on the Secured Party's part to exercise any right or power arising hereunder will impair any such right or power or be considered a waiver of any such right or power, nor will the Secured Party's action or inaction impair any such right or power. The Secured Party's rights and remedies hereunder are cumulative and not exclusive of any other rights or remedies which the Secured Party may have under other agreements, at law or in equity.

**12. Illegality.** In case any one or more of the provisions contained in this Agreement should be invalid, illegal or unenforceable in any respect, the validity, legality and enforceability of the remaining provisions contained herein shall not in any way be affected or impaired thereby.

**13. Changes in Writing.** No modification, amendment or waiver of any provision of this Agreement nor consent to any departure by the Debtor therefrom will be effective unless made in a writing signed by the Secured Party, and then such waiver or consent shall be effective only in the specific instance and for the purpose for which given. No notice to or demand on the Debtor in any case will entitle the Debtor to any other or further notice or demand in the same, similar or other circumstance.

3

**14. Entire Agreement.** This Agreement (including the documents and instruments referred to herein) constitutes the entire agreement and supersedes all other prior agreements and understandings, both written and oral, between the parties with respect to the subject matter hereof.

**15. Counterparts.** This Agreement may be signed in any number of counterpart copies and by the parties hereto on separate counterparts, but all such copies shall constitute one and the same instrument. Delivery of an executed counterpart of a signature page to this Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart. Any party so executing this Agreement by facsimile transmission shall promptly deliver a manually executed counterpart, provided that any failure to do so shall not affect the validity of the counterpart executed by facsimile transmission.

**16. Successors and Assigns.** This Agreement will be binding upon and inure to the benefit of the Debtor and the Secured Party and their respective heirs, executors, administrators, successors and assigns; provided, however, that the Debtor may not assign this Agreement in whole or in part without the Secured Party's prior written consent and the Secured Party at any time may assign this Agreement in whole or in part.

**17. Interpretation.** In this Agreement, unless the Secured Party and the Debtor otherwise agree in writing, the singular includes the plural and the plural the singular; words importing any gender include the other genders; references to statutes are to be construed as including all statutory provisions consolidating, amending or replacing the statute referred to; the word "or" shall be deemed to include "and/or", the words "including", "includes" and "include" shall be deemed to be followed by the words "without limitation"; references to articles, sections (or subdivisions of sections) or exhibits are to those of this Agreement unless otherwise indicated. Section headings in this Agreement are included for convenience of reference only and shall not constitute a part of this Agreement for any other purpose. If this Agreement is executed by more than one Debtor, the obligations of such persons or entities will be joint and several.

**18. Governing Law and Jurisdiction.** This Agreement has been delivered to and accepted by the Secured Party and will be deemed to be made in the State of Illinois. **THIS AGREEMENT WILL BE INTERPRETED AND THE RIGHTS AND LIABILITIES OF THE PARTIES HERETO DETERMINED IN ACCORDANCE WITH THE LAWS OF THE STATE OF ILLINOIS, EXCEPT THAT THE LAWS OF THE STATE WHERE ANY COLLATERAL IS LOCATED, IF DIFFERENT, SHALL GOVERN THE CREATION, PERFECTION AND FORECLOSURE OF THE LIENS CREATED HEREUNDER ON SUCH PROPERTY OR ANY INTEREST THEREIN.** The Debtor hereby irrevocably consents to the exclusive jurisdiction of any state or federal court in Illinois, provided that nothing contained in this Agreement will prevent the Secured Party from bringing any action, enforcing any award or judgment or exercising any rights against the Debtor individually, against any security or against any property of the Debtor within any other county, state or other foreign or domestic jurisdiction. The Secured Party and the Debtor agree that the venue provided above is the most convenient forum for both the Secured Party and the Debtor. The Debtor waives any objection to venue and any objection based on a more convenient forum in any action instituted under this Agreement.

**20. WAIVER OF JURY TRIAL. EACH OF THE DEBTOR AND THE SECURED PARTY IRREVOCABLY WAIVES ANY AND ALL RIGHT IT MAY HAVE TO A TRIAL BY JURY IN ANY ACTION, PROCEEDING OR CLAIM OF ANY NATURE RELATING TO THIS AGREEMENT, ANY DOCUMENTS EXECUTED IN CONNECTION WITH THIS AGREEMENT OR ANY TRANSACTION CONTEMPLATED IN ANY OF SUCH DOCUMENTS. THE DEBTOR AND THE SECURED PARTY ACKNOWLEDGE THAT THE FOREGOING WAIVER IS KNOWING AND VOLUNTARY.**

(EXECUTION PAGE FOLLOWS)

IN WITNESS WHEREOF, the parties have executed this Agreement as of the day and date first above written.

**DEBTOR:**

**Patrick Dillon, Individually**

By: _____
Patrick Dillon,

**SECURED PARTIES:**

Catherine Wenskus, not individually but Administrator of the Chicago & Vicinity Laborers' District Council Pension Plan, Chicago & Vicinity Laborers' District Council Health & Welfare Plan, Chicago & Vicinity Laborers' District Council Retiree Health & Welfare Plan, and as agent of the Construction and General Laborers' District Council of Chicago and Vicinity Training Fund, the Chicago Area Laborers-Employers Cooperation and Education Trust, the Laborers' District Council Labor-Management Cooperation Committee, and the Chicago Area Independent Construction Association Fund Industry Advancement Fund.

By: _____
Catherine Wenskus, Administrator

**The Construction and General Laborers' District Council of Chicago and Vicinity**

By: _____
Martin Flanagan

5